1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   NAEN PHACHANH,                              No.  2:14-cv-1805 AC

12                   Plaintiff,

13        v.                                     ORDER

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                     Defendant.
16

17

18        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

19   ("Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II

20   of the Social Security Act, 42 U.S.C. §§ 42 U.S.C. §§ 401-34, and for Supplemental Security

21   Income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383f.

22   DIB is paid to disabled persons who have contributed to the Disability Insurance Program, and

23   who suffer from a mental or physical disability.  42 U.S.C. § 423(a)(1); Bowen v. City of New

24   York, 476 U.S. 467, 470 (1986).  SSI is paid to financially needy disabled persons.  42 U.S.C.

25   § 1382(a); Washington State Dept. of Social and Health Services v. Guardianship Estate of

26   Keffeler, 537 U.S. 371, 375 (2003) ("Title XVI of the Act, § 1381 *et seq.*, is the Supplemental

27   Security Income (SSI) scheme of benefits for aged, blind, or disabled individuals, including

28   children, whose income and assets fall below specified levels . . .").

1

1                                   I.  PROCEDURAL BACKGROUND

2         Plaintiff applied for DIB on March 16, 2010.  Administrative Record ("AR") 15.[1]  He

3 applied for SSI on April 1, 2010.  Id.  Both applications alleged a disability onset date of

4 January 21, 2010.  Id.  Both applications were disapproved initially, AR 68-72 (Exh. 1B), and on

5 reconsideration, AR 76-81  (Exh. 4B).  Plaintiff thereupon requested a hearing before an

6 administrative law judge ("ALJ"), to challenge the disapproval.  AR 82 (Exh. 5B).  On April 27,

7 2012, ALJ Mark C. Ramsey presided over the first of two hearings.  AR 55-60 (transcript of

8 hearing).  At this hearing, plaintiff appeared without counsel.  Id.  The hearing was adjourned

9 after plaintiff indicated that he wanted to get a representative.  AR 58-60.  ALJ Ramsey presided

10 over the second hearing.  AR 29-54 (transcript).  At this hearing, plaintiff was represented by

11 counsel.  Id.

12         In a decision dated January 16, 2013, the ALJ issued an unfavorable decision, finding

13 plaintiff "not disabled" under Sections 216(i) and 223(d) of the Act (Title II), 42 U.S.C. §§ 416(i),

14 423(d), and Section 1614(a)(3)(A) of the Act (Title XVI), 42 U.S.C. § 1382c(a)(3)(A).  AR 15-27

15 (decision and exhibit list).

16         Plaintiff asked the Appeals Council ("Council") to review the ALJ's decision.  AR 10.  On

17 July 2, 2014, the Appeals Council denied review, leaving the ALJ's decision as the final decision

18 of the Commissioner of Social Security.  AR 1-3.  Plaintiff filed this action on July 31, 2014.

19 ECF No. 1; see 42 U.S.C. §§ 405(g), 1383c(3).  In due course, plaintiff was granted leave to

20 proceed in forma pauperis, the parties consented to the jurisdiction of the magistrate judge, the

21 Commissioner filed the administrative record, and the parties filed and fully briefed the pending

22 cross-motions for summary judgment.  ECF Nos. 3, 7, 9, 12, 13, 18 & 19.

23         For the reasons that follow, the court will deny plaintiff's motion for summary judgment,

24 and will grant the Commissioner's cross-motion for summary judgment.

25 ///

26 ///

27

28

---

[1] The Administrative Record is electronically filed at ECF Nos. 12-3 to 12-9.

## II.  FACTUAL BACKGROUND

Plaintiff was born on December 13, 1965, and was 44 years old on the alleged onset date of his disabilities, January 21, 2010.  AR 22.  Plaintiff has a high school education and can communicate in English.  AR 22.  Plaintiff is not a U.S. citizen, but is a lawful permanent resident in possession of a "green card."  AR 34.

## III.  LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld "if it is supported by substantial evidence and if the Commissioner applied the correct legal standards." Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).  "'The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . ..'" Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) (quoting 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla," but "may be less than a preponderance."  Molina v. Astrue , 674 F.3d 1104, 1111 (9th Cir. 2012).  "It means such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  "While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice."  Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted). Although this court cannot substitute its discretion for that of the Commissioner, the court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion."  Desrosiers v. Secretary of HHS, 846 F.2d 573, 576 (9th Cir.1988); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) ("The court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion; it may not affirm simply by isolating a specific quantum of supporting evidence.").

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  However, the court may review only the reasons stated by the

3

1   ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." Orn

2   v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir.

3   2003) ("It was error for the district court to affirm the ALJ's credibility decision based on

4   evidence that the ALJ did not discuss").

5         The court will not reverse the Commissioner's decision if it is based on harmless error,

6   which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the

7   ultimate nondisability determination.'" Robbins v. SSA, 466 F.3d 880, 885 (9th Cir. 2006)

8   (quoting Stout v. Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v.

9   Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

10   IV.  RELEVANT LAW

11         Disability Insurance Benefits and Supplemental Security Income are available for every

12   eligible individual who is "disabled." 42 U.S.C. §§ 423(a)(1)(E) (DIB), 1381a (SSI). Plaintiff is

13   "disabled" if he is "'unable to engage in substantial gainful activity due to a medically

14   determinable physical or mental impairment . . ..'" Bowen v. Yuckert, 482 U.S. 137, 140 (1987)

15   (quoting identically worded provisions of 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).

16         The Commissioner uses a five-step sequential evaluation process to determine whether an

17   applicant is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4);

18   Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (setting forth the "five-step sequential evaluation

19   process to determine disability" under Title II and Title XVI). The following summarizes the

20   sequential evaluation:

21   
22         Step one: Is the claimant engaging in substantial gainful activity? If
          so, the claimant is not disabled. If not, proceed to step two.

23   20 C.F.R. §§ 404.1520(a)(4)(i), (b) and 416.920(a)(4)(i), (b).

24         Step two: Does the claimant have a "severe" impairment? If so,
25         proceed to step three. If not, the claimant is not disabled.

    Id., §§ 404.1520(a)(4)(ii), (c) and 416.920(a)(4)(ii), (c).
26   
27         Step three: Does the claimant's impairment or combination of
          impairments meet or equal an impairment listed in 20 C.F.R., Pt.
          404, Subpt. P, App. 1? If so, the claimant is disabled. If not,
28         proceed to step four.

4

1   Id., §§ 404.1520(a)(4)(iii), (d) and 416.920(a)(4)(iii), (d).

2       Step four: Does the claimant's residual functional capacity make
        him capable of performing his past work?  If so, the claimant is not
3       disabled.  If not, proceed to step five.

4   Id., §§ 404.1520(a)(4)(iv), (e), (f) and 416.920(a)(4)(iv), (e), (f).

5       Step five: Does the claimant have the residual functional capacity
        perform any other work?  If so, the claimant is not disabled.  If not,
6       the claimant is disabled.

7   Id., §§ 404.1520(a)(4)(v), (g) and 416.920(a)(4)(v), (g).

8       The claimant bears the burden of proof in the first four steps of the sequential evaluation

9   process.  20 C.F.R. §§ 404.1512(a) ("In general, you have to prove to us that you are blind or

10  disabled"), 416.912(a) (same); Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden

11  if the sequential evaluation process proceeds to step five.  Bowen, 482 U.S. at 146 n.5.

12                          V.  THE ALJ's DECISION

13      The ALJ made the following findings:

14      1. The claimant meets the insured status requirements of the Social
        Security Act through March 31, 2015.
15

16      2. [Step 1] The claimant has not engaged in substantial gainful
        activity since January 21, 2010, the alleged onset date (20
17      CFR 404.1571 et seq., and 416.971 et seq.).

18      3. [Step 2] The claimant has the following severe impairments:
        gout, diabetes mellitus and history of seizures (20 CFR 404.1520(c)
19      and 416.920(c)).

20      4. [Step 3] The claimant does not have an impairment or
        combination of impairments that meets or medically equals the
21      severity of one of the listed impairments in 20 CFR Part 404,
        Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
22      416.920(d), 416.925 and 416.926).

23      5. [Step 4] After careful consideration of the entire record, the
        undersigned finds that the claimant has the residual functional
24      capacity to perform light work as defined in 20 CFR404.1567(b)
        and 416.967(b) except occasional posturals and no work around
25      moving machinery or heights due to seizures.

26      6. [Step 4, continued] The claimant is unable to perform any past
        relevant work (20 CFR 404.1565 and 416.965).

27      7. [Step 5] The claimant was born on December 13, 1965 and was
        44 years old, which is defined as a younger individual age 18-49,
28      on the alleged disability onset date (20 CFR 404.1563 and

1    416.963).

2        8. [Step 5, continued] The claimant has at least a high school
         education and is able to communicate in English (20 CFR 404.1564
3        and 416.964).

4        9. [Step 5, continued] Transferability of job skills is not material to
         the determination of disability because using the Medical-
5        Vocational Rules as a framework supports a finding that the
         claimant is "not disabled," whether or not the claimant has
6        transferable job skills (See SSR 82-41 and 20 CFR Part 404,
         Subpart P, Appendix 2).
7
         10. [Step 5, continued] Considering the claimant's age, education,
8        work experience, and residual functional capacity, there are jobs
         that exist in significant numbers in the national economy that the
9        claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969,
         and 416.969(a)).
10
         11. The claimant has not been under a disability, as defined in the
11       Social Security Act, from January 21, 2010, through the date of this
         decision (20 CFR 404.1520(g) and 416.920(g)).
12

13   AR 17-22.

14                              VI.  ANALYSIS

15       Plaintiff argues that the ALJ erred by: (1) failing to make findings at Steps 2 and 3

16   regarding plaintiff's vision impairments; (2) failing to evaluate properly the opinion of Dr. Reed,

17   an examining physician; (3) improperly discrediting plaintiff's subjective complaints and asserted

18   limitations; (4) failing to support with substantial evidence, his finding that plaintiff could

19   perform light exertion work; and (5) relying solely on the Medical-Vocational Guidelines to find

20   that plaintiff was not disabled.

21       A.  Plaintiff's Alleged Vision Impairments – Step 2

22       At Step 2 of the sequential analysis, the ALJ was required to determine if plaintiff has

23   medically determinable impairments that are "severe" enough to significantly limit plaintiff's

24   ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  "Basic work

25   activities" include "seeing."  20 C.F.R. §§ 404.1521(b)(2) ("basic work activities" includes

26   "[c]apacities for seeing"), 416.921(b)(2) (same).[2]

27   _____

28   [2] The Commissioner has issued policy guidance, binding on ALJs, specifically addressing the
     (continued…)

6

1    Plaintiff argues that the ALJ erred by failing to make findings regarding his alleged vision

2    impairments at Step 2.  See Memorandum in Support of Plaintiff's Motion for Summary

3    Judgment (ECF No. 13-1) ("Plaintiff's Motion") at 10-11.  Defendant asserts that the ALJ did

4    make such findings, and argues that the ALJ "properly found that Plaintiff did not have a severe

5    vision impairment or satisfy a vision impairment" in the Listings, citing AR 17-22.  Defendant's

6    Cross-Motion for Summary Judgment (ECF No. 18) ("Defendant's Motion") at 5.  Specifically,

7    defendant asserts that the ALJ found the alleged vision impairment "not to be 'severe' at step

8    two," but does not cite to anywhere in the record for this assertion.  Id. at 6.  Instead, defendant

9    unhelpfully cites the ALJ's entire Findings of Fact and Conclusions of Law for this assertion.  Id.

10   Defendant further asserts that the ALJ determined that plaintiff could perform light work "without

11   any visual limitations," citing "AR 18" of the ALJ's decision, even though AR 18 makes no

12   reference to any visual limitations or absence thereof.  Id.

13   Plaintiff is correct that the ALJ did not make any express finding regarding plaintiff's

14   alleged vision impairments at Step 2.  At Step 2, the ALJ found that plaintiff's gout, diabetes

15   mellitus and seizures were "severe," and that his high blood pressure and high cholesterol, were

16   "not severe."  AR 17.  Contrary to defendant's assertion, the ALJ did not find that plaintiff's

17   vision impairment was not severe; there is simply no mention of it.  The ALJ did find at Step 2

18   that plaintiff has the severe impairment of diabetes mellitus.  AR 17.  However, if defendant

19   means to argue that every mention of "diabetes" in the decision is also a reference to the visual

20   complications arising from the disease, the court rejects the argument.  The complications the

21   ALJ mentions as arising from diabetes, or that plaintiff testified to, are numbness  and tingling in

22   the arms and legs, AR 19, 46, and dizziness, AR 47, in addition to retinopathy, AR 48.  Defendant

23   seems to be arguing that the ALJ did not err because he must have found that plaintiff had no

24   ///

25

26   _____
     evaluation of claims relating to diabetes mellitus and its visual consequences.  See SSR 14-2P,
     2014 WL 2472008 (June 2, 2014) ("Titles II and XVI: Evaluating Diabetes Mellitus").

27   However, the effective date is June 14, 2014 – after the ALJ issued his decision – and neither side
     has mentioned it or argued that it applies to this case.

28

1  severe vision impairment, because if he did not so find, then that would be error.  This is just

2  circular reasoning; it is not an acceptable legal argument.

3  Nevertheless, the ALJ's failure to make the required Step 2 finding regarding plaintiff's

4  alleged severe vision impairment is harmless error in this case, because, as discussed below,

5  plaintiff presented no acceptable medical evidence that he had a severe vision impairment.  See

6  Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) ("an ALJ's error is harmless where it is

7  'inconsequential to the ultimate nondisability determination'") (quoting Carmickle v. Comm'r,

8  SSA, 533 F.3d 1155, 1162 (9th Cir. 2008)).

9  1.  Evidence of severe vision impairment

10  A Step 2 severe mental or physical impairment "must result from anatomical,

11  physiological, or psychological abnormalities which can be shown by medically acceptable

12  clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1508, 416.908.  It must be

13  established "by medical evidence consisting of signs, symptoms, and laboratory findings," and

14  not only by plaintiff's "statement of symptoms."  Id.; Ukolov v. Barnhart, 420 F.3d 1002,

15  1004-05 (9th Cir. 2005); SSR 96–4p, 1996 WL 374187, at *1 (July 2, 1996); see also 42 U.S.C.

16  §§ 423(d)(3) ("physical or mental impairment" is one that "results from anatomical,

17  physiological, or psychological abnormalities which are demonstrable by medically acceptable

18  clinical and laboratory diagnostic techniques"), 1382c(a)(3)(D) (same).  The ALJ also considers

19  "statements from . . . acceptable medical sources that reflect judgments about the nature and

20  severity of your impairment(s), including your symptoms, diagnosis and prognosis, [and] what

21  you can still do despite [your] impairment(s) . . .."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

22  a.  Thomas A. Flynn, O.D.

23  The record contains medical evidence of plaintiff's vision disorder from four sources.

24  Plaintiff's treating optometrist, Thomas A. Flynn, O.D., examined plaintiff on March 12, 2012.

25  Dr. Flynn, in his "Examination Record" diagnosed plaintiff with "Presbyopia,"[3] "Myopia,"[4]

26

27

28

---

[3] "Presbyopia" is a loss of flexibility in the eye's lens, and which requires a person to hold objects at a distance in order to see them more clearly.  See Attorneys Medical Advisor § 16:15 (available on Westlaw).

"Diabetes W/ocular Involvement, Adult," and "Mild Nonproliferative diabetic retinopathy." AR 398 (Exh. 16F).  Diabetic retinopathy is a vision disorder arising from diabetes, and can impair vision.  See Stedmans Medical Dictionary 779660 (Nov. 2014) (available through Westlaw).[5]

Dr. Flynn reported plaintiff's "unaided acuity" for distance ("DVA") to be 20/30 in both eyes.  AR 397.  He reported plaintiff's unaided near visual acuity ("NVA") to be "HM," or hand-motion-only.  Id.  However, Dr. Flynn also reported that plaintiff's "Presenting Spectacle Rx," his vision was 20/25 in the right eye ("OD"), and 20/30 in the left ("OS").[6]  Id.  Plaintiff's near vision was reported to be 20/50 in both eyes.  Id.  Finally, Dr. Flynn apparently prescribed glasses for plaintiff ("Final Spectacle Rx"), with resulting distance vision of "20/25+" in both eyes, and resulting near vision of 20/30 in both eyes.  Id.[7]

There is no statement or other indication in Dr. Flynn's report that plaintiff's vision acuity – whether corrected or unaided – was such as to significantly limit plaintiff's ability to see, or to carry out any other basic work activity.  To the contrary, plaintiff does not argue that his apparently corrected vision of "20/25+" and "20/30" for both eyes, near and distance vision, is limiting in any way.

///

///

_____

[4] "Myopia" is a condition in which a person can see close objects well, but distant objects are not clear.  See Attorneys Medical Advisor § 3:74.

[5] Specifically, "diabetic retinopathy" refers to changes in the retinas of people who have diabetes mellitus.  See Stedmans Medical Dictionary 779660.  The "nonproliferative" version ("NPDR") is the most common form of this condition, and "can impair vision by destroying retinal tissue directly and by predisposing to retinal edema, retinal detachment, and vitreous hemorrhage."  Id.  Its features can be observed on funduscopic examination, and include "cotton wool exudates," and "dot-and-blot hemorrhages."  Id.

[6] The court interprets "Presenting Spectacle Rx" to mean the glasses plaintiff was already wearing.

[7] Dr. Flynn also reports that plaintiff's "Confrontation Fields" – which appears to refer to plaintiff's field of vision – were "full in all quadrants"  AR 397.  Neither party discusses plaintiff's field of vision – the other measure of possible visual impairment besides visual acuity – so the court does not consider it further.

1

b. Dr. John E. Stabel

2

On April 2, 2012, an examining physician, Dr. John E. Stabel (Stabel Eye Clinic),

3

diagnosed plaintiff with "moderate" non-proliferating diabetic retinopathy. AR 439 (Exh. 19F).

4

Dr. Stabel also found "Scattered Macular Dot/Blot Hemorrhage," AR 440, which is a "feature" of

5

diabetic retinopathy. See Stedmans Medical Dictionary 779660. Dr. Stabel reported plaintiff's

6

"vision" to be 20/20 in the right eye, and 20/40 in the left. AR 441. However, the court is unable

7

to tell if this refers to plaintiff's unaided vision or his corrected vision, or to his distance or near

8

vision, and neither party offers any guidance on this.[8]

9

On July 31, 2012, Dr. Stabel again examined plaintiff. AR 433-38 (Exh. 19F). Dr. Stabel

10

again diagnosed plaintiff with "moderate" non-proliferating diabetic retinopathy. AR 434. This

11

time, Dr. Stabel found "cotton wool spots" on both eyes, and "some hemorrhage and exudate" on

12

the right eye. AR 435. As noted, these signs are "features" of diabetic retinopathy. See

13

Stedmans Medical Dictionary 779660. Dr. Stabel reported plaintiff's vision on this examination

14

to be 20/60 in both eyes, and stated that plaintiff's vision "has decreased in the last four months."

15

AR 434, 436. Plaintiff argues that these findings are "consistent with plaintiff's report that his

16

glasses did not help anymore." See Plaintiff's Motion at 12. However, the court is again unable

17

to determine if the reported vision is unaided or corrected, near or distance.

18

There is no statement or other indication in either of Dr. Stabel's reports of what

19

plaintiff's corrected vision is. However, even if the "20/60" report refers to plaintiff's corrected

20

vision, there is no statement or indication that it was such as to significantly limit plaintiff's

21

ability to see, or to carry out any other basic work activity. It might well be a reasonable lay

22

conclusion that corrected vision of 20/60 in both eyes would impair the ability to see. However,

23

it is plaintiff's burden to present acceptable medical evidence of the claimed severe impairment.

24

It is not enough to simply present a measurement and leave it to the court – which is not

25

///

26

_____

27

[8] The report contains the notation "DSC" as the "type" of vision, but the court does not know
what this stands for, and as noted, neither party offers any guidance.

28

1    authorized to "play doctor" – to conclude that the cited measurement is severe enough to limit

2    plaintiff's ability to conduct basic work activities.

3        Plaintiff does point to his own statement that he sometimes gets "blurred vision," and that

4    glasses were not helping.  Even if these statements were evidence of a severe vision impairment,

5    the only evidence supporting such a claim of impairment is plaintiff's own statement, which is

6    not enough to establish such an impairment.  See 20 CFR §§ 404.1508 ("[a] physical or mental

7    impairment must be established by medical evidence consisting of signs, symptoms, and

8    laboratory findings, not only by your statement of symptoms"), 416.908 (same); Haddix v.

9    Colvin, 2014 WL 128035 at *3 (E.D. Cal. 2014) (same).

10                        c.  J. Brian Reed, M.D.

11        After noting the deterioration in plaintiff's sight, Dr. Stabel referred plaintiff to J. Brian

12    Reed, M.D., of Retinal Consultants Medical Group, Inc.  On August 14, 2012, plaintiff was

13    examined by Dr. Reed.  AR 427-32 (Exh. 18F).  Dr. Reed's "Impression" was that plaintiff had

14    "[s]evere" non-proliferative diabetic retinopathy, as well as "Hypertensive retinopathy."  AR 428.

15        Dr. Reed found that plaintiff's vision was 20/25 in the right eye, and 20/30 in the left.

16    AR 428, 430.  Once again, the court is unable to determine if this refers to plaintiff's corrected or

17    unaided vision, or his near or distance vision.  See AR 20.

18        This is the only report of plaintiff's vision that is specifically mentioned in the ALJ's

19    decision.  Like the prior reports, Dr. Reed's contains no statement or indication that plaintiff's

20    vision was such as to significantly limit plaintiff's ability to see, or to carry out any other basic

21    work activity.

22                        d.  John Tendall, M.D.

23        Finally, on November 9, 2012, plaintiff was examined by John Tendall, M.D., of MDSI

24    Physician Services.  AR 452-57 (Exh. 20F).  Although Dr. Tendall acknowledges the report from

25    Dr. Reed, he alone among the four examining or treating doctors does not diagnose plaintiff with

26    any visual disorder.  Id.  Dr. Tendall examined plaintiff's eyes, but possibly did not perform a

27    funduscopic exam, which would permit him to observe the features of diabetic retinopathy if they

28    were present.  AR 455 ("I cannot visualize his fundus").  As noted, the features of diabetic

retinopathy "can be observed on funduscopic examination." See Stedmans Medical Dictionary 779660.  The fundus is "the interior lining of the eyeball, including the retina, optic disc, and macula, which can be seen through the pupil during an eye examination."  Attorneys Medical Advisor § 36:353 (emphasis added).

Dr. Tendall found plaintiff's corrected distance vision to be 20/40 in both eyes.  AR 455.[9] Dr. Tendall additionally completed a Medical Source Statement checking off the box indicating that plaintiff had no impairments affecting his vision, and also that plaintiff was not limited by any visual impairment that was present.  AR 449.  Dr. Tendall's report is confusing in this respect because he checked off the box saying that there were no impairments, but he also checked off the limitations boxes even though those boxes were only to be checked off he had found that there were impairments.  Thus, he states both that there is no visual impairment, and also that any visual impairment that is present creates no functional limitations for plaintiff.  Regardless of its possibly confusing nature, Dr. Tendall's report contains no statement or indication that plaintiff's vision was such as to significantly limit his ability to perform basic work functions.  To the contrary, Dr. Tendall affirmatively found that plaintiff was not limited in any way by any visual impairment.[10]

    2.  Plaintiff's argument

        a.  Existence of a visual impairment

As discussed above, plaintiff has identified no evidence in the record showing that he has a vision impairment, even a non-severe vision impairment.  Plaintiff argues that he has established that he has a medically determinable impairment because he has shown that he has severe nonproliferative diabetic retinopathy.  AR 10.  However, the existence of a visual disorder, such as diabetic retinopathy, does not establish the existence of an impairment or limitation, severe or non-severe, arising from that disorder.

---

[9] The court infers that this is a "distance" reading because Dr. Tendall's reference to "Snellen" testing is a reference to "visual acuity testing for distance."  See Listings ¶ 2.00A(5)(a).

[10] Even if the court were to disregard Dr. Tendall's report, it is still plaintiff's burden to establish that he has a severe impairment for purposes of Step 2.  Removing this report from consideration does not add anything to what plaintiff has produced.

1    The Commissioner's regulations, and the cases applying them, expressly

2    distinguish between visual disorders and the limitations those disorders may cause:

3        Visual disorders are abnormalities of the eye . . . that may cause a
         loss of visual acuity . . ..  A loss of visual acuity limits your ability

4        to distinguish detail, read, or do fine work.

5    Listings ¶ 2.00A(1); see also Listings ¶ 2.00A(4) (setting out conditions in which the

6    Commissioner "will request a description of how your visual disorder affects your ability to

7    function"); accord, Sample v. Schweiker, 694 F.2d 639, 642-43 (9th Cir. 1982) ("[t]he existence

8    of emotional disorder, however, is not per se disabling.  In addition, there must be proof of the

9    impairment's disabling severity") (internal quotation marks and citations omitted); Erickson v.

10   Colvin, 2014 WL 4925256 at *6 (E.D. Cal. 2014) ("assuming the existence of a medically

11   diagnosed condition of fibromyalgia, Dr. Chin did not provide an opinion regarding plaintiff's

12   functional limitations, [so] there was simply no opinion for the ALJ to reject"); Barber v. Astrue,

13   2012 WL 458076 at *14 (E.D. Cal. 2012) ("the diagnosis alone did not shed light on the degree of

14   limitation Plaintiff suffered"); Kimzey v. Commissioner of Social Sec., 2011 WL 1230818 at *12

15   (E.D. Cal. 2011) ("[a] medical diagnosis alone does not demonstrate how that condition impacts

16   plaintiff's ability to engage in basic work activities"); Roberts v. Astrue, 2010 WL 3943636 at *8

17   (E.D. Cal. 2010) ("[a] diagnosis alone does not establish a limitation in the ability to work").

18       For example, Dr. Flynn, plaintiff's treating optometrist, diagnosed plaintiff with the very

19   disorders that plaintiff argues establish his impairment, namely presbyopia, myopia, diabetes with

20   ocular involvement, and mild non-proliferative diabetic retinopathy.  AR 398.  Yet Dr. Flynn also

21   apparently prescribed corrective lenses that would leave plaintiff's corrected vision at a combined

22   "20/20-" for distance, and "20/25" for near vision.  AR 397.  Plaintiff offers no explanation for

23   why plaintiff's ability to see, as measured by these clinical findings, or to perform any other basic

24   work function, is impaired in any way by his presbyopia, myopia, diabetes with ocular

25   involvement, or retinopathy.

26       Even if the court accepts plaintiff's worst clinical findings – 20/60 vision in both eyes, and

27   "severe" non-proliferative retinopathy together with the various noted features of the retinopathy

28   – none of the medical records explain what functional impairment plaintiff suffers as a result of

13

those conditions.  The court is not authorized to substitute its own lay view of what level of vision

would significantly affect plaintiff's ability to work.  Instead, the court looks to medical evidence

of impairment.  Plaintiff has provided none.

b. Development of the record

Plaintiff argues that the ALJ erred by not fully and fairly developing the record once

plaintiff established the existence of his visual disorder, namely, severe non-proliferative diabetic

retinopathy, citing Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983).  Plaintiff's Motion

at 10-11.  Defendant responds that the ALJ's duty to further develop the record "is only triggered

when the evidence is inadequate to make a determination concerning disability under the Act,"

citing 20 C.F.R. § 404.1512(e)(1) (Commissioner may request a consultative exam), and McLeod

v. Astrue, 640 F.3d 881, 884-85 (9th Cir. 2011).  Defendant's Motion at 7.

"An ALJ's duty to develop the record further is triggered only when there is ambiguous

evidence or when the record is inadequate to allow for proper evaluation of the evidence."

Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) (citing Tonapetyan v. Halter, 242 F.3d

1144, 1150 (9th Cir. 2001)).  This requirement to further develop the record in this circumstance

derives from the ALJ's independent duty to "fully and fairly develop the record and to assure that

the claimant's interests are considered."  Tonapetyan, 242 F.3d at 1150 (internal quotation marks

omitted).  Where, as here, plaintiff is represented by a lay representative before the ALJ, "the ALJ

must be especially diligent in exploring for all the relevant facts."  Id.[11]

Here, the evidence is not ambiguous.  While the medical evidence is undisputed that

plaintiff has diabetic retinopathy, there is no medical evidence that this disorder limits plaintiff's

ability to perform basic work functions.  However, the question of possible "inadequacy" is more

complex.  The Commissioner's regulations describe "visual disorders" as "abnormalities of the

eye . . . that may cause a loss of visual acuity . . .."  Listings ¶ 2.00A(1).  As discussed above,

non-proliferative diabetic retinopathy is such a visual disorder.  Moreover, notwithstanding the

---

[11] Plaintiff's representative during the administrative stage was a paralegal.  AR 15, 94, 95,
201-02.

general principle that it is plaintiff's burden to prove that he is disabled, the Commissioner's regulations regarding vision disorders state: "If your visual disorder does not satisfy the criteria in 2.02, 2.03, or 2.04, we will request a description of how your visual disorder affects your ability to function."  Listings ¶ 2.00A(4).  Here, plaintiff has a visual disorder that plainly does not satisfy the specified criteria, potentially triggering the Commissioner's obligation to seek further information about plaintiff's ability to function.[12]

The ALJ did, however, have an assessment of how plaintiff's visual disorder affected his ability to function: Dr. Tendall's assessment.  As noted above, Dr. Tendall apparently did not conduct a funduscopic examination of plaintiff.  However, he did specifically acknowledge plaintiff's diagnosis of "severe nonproliferative diabetic retinopathy with hypertensive retinopathy," made by an examining physician, Dr. Reed.  AR 452.  Accordingly, Dr. Tendall's subsequent functional assessment can fairly be said to be based upon clinical medical findings, even though they are not all his own.  Dr. Tendall's functional assessment concluded that plaintiff was not impaired in any way related to his vision.  Specifically, he concluded that plaintiff could "avoid ordinary hazards in the workplace," "read very small print," "read ordinary newspaper or book print," "view a computer screen," and "determine differences in shape and color of small objects such as screws, nuts or bolts."  AR 449.

Accordingly, the court finds that the ALJ's failure to specifically mention "vision impairment" at Step 2 was, at worst, harmless error, since there was no medical evidence to support any level of such impairment.

c.  Alleged failure to consider clinical findings

Plaintiff argues that the ALJ "disregarded" Dr. Reed's and Dr. Stabel's clinical findings.  Plaintiff's Motion at 12.  That is not correct.  First, as far as can be gleaned from the administrative record, the reports of both doctors incorporated their clinical findings.  See

---

[12] Listings ¶ 2.02 applies only if plaintiff's "[r]emaining vision in the better eye after best correction is 20/200 or less."  Listings ¶ 2.03 applies only to loss of "visual field," but there is no medical opinion or clinical finding that plaintiff has any loss of visual field.  Listings ¶ 2.04 applies only if plaintiff has a specified "visual efficiency percentage," or a specified "visual impairment value."  Plaintiff does not assert that he meets any of these criteria.

15

AR 428, 429-32. Among the alleged clinical findings that plaintiff claims that the ALJ "disregarded" are "abnormalities" of the retina, "edema in the macula of both eyes," "Scattered Dob/Blot hemorrhage," and "cotton wool spots." Plaintiff's Motion at 12.[13] However, each of these findings is a <u>feature</u> of diabetic retinopathy, which both doctors diagnosed and reported upon. Plaintiff does not explain why the ALJ was required to consider each clinical finding separately from his consideration of the doctors' reports, given that those clinical findings are incorporated into the reports.

Second, none of the clinical findings that the ALJ allegedly disregarded shows that the plaintiff had a visual impairment that limited his ability to perform basic work activities, including "seeing." Rather, they tended only to show, as discussed above, that plaintiff had a visual disorder, namely, diabetic retinopathy.

Plaintiff alleges that there are clinical findings that plaintiff's vision is getting worse and cannot be helped with glasses. Plaintiff's Motion at 12. However, the clinical findings, other than Dr. Reed's, do not specify whether the reported worsening vision is unaided or corrected, and therefore the court has no way to interpret the differing visual acuity findings.

### d. "Conflicting" opinions

Plaintiff argues that there is a conflict between the findings of Dr. Reed and Dr. Stabel, who found "that plaintiff had severe non-proliferative diabetic retinopathy," and the opinions of Dr. Tendall and Dr. Estrin, who found that plaintiff had "no visual impairment limitations." Plaintiff's Motion at 12. There is no conflict, as the findings are entirely consistent. Dr. Reed and Dr. Stabel found that plaintiff had a visual disorder, namely, non-proliferative diabetic retinopathy ("severe" in Dr. Reed's diagnosis, and "moderate" in Dr. Stabel's). AR 428 (Reed), 434 (Stabel, July 31, 2012), 439 (Stabel, April 2, 2012). Dr. Estrin and Dr. Tendall found that that plaintiff did not have any visual functional limitations. AR 253 (Estrin), 449 (Tendall).

---

[13] The court is unable to find some of the alleged clinical findings that plaintiff says the ALJ disregarded, for example, the "five month progression of seeing 'flashes, floaters, and distortions,'" which plaintiff alleges can be found at "Tr. 431." Even if all of these clinical findings exist, plaintiff does not explain why he thinks they were not incorporated into the doctors' reports or diagnoses.

1    There is no conflict between finding that a visual disorder exists, on the one hand, and finding

2    that no visual functional limitation exists, on the other.

3         As discussed above, Dr. Tendall expressly acknowledged that plaintiff had the visual

4    disorder of severe non-proliferative diabetic retinopathy, as Dr. Reed found.  AR 452.

5    Dr. Tendall then went on to find that there was no visual impairment.  AR 449.  Dr. Estrin also

6    found that there was no visual functional impairment (although he did not mention any visual

7    disorders).  AR 253.  There is no conflict between Dr. Reed and Dr. Stabel on the one hand, and

8    Dr. Kendall and Dr. Estrin on the other, because they reported conclusions about different things:

9    visual disorders on the one hand, and visual functional limitations on the other.

10              3.  Vision Impairment at Step 3

11        Because there is no evidence of a vision impairment, the ALJ had no basis for considering

12   the severity or effects of any "vision impairment" at Step 3.  That is because the requirement to

13   look at the Listings at Step 3 only exists if there exists a severe, medically determinable

14   impairment.  See 20 C.F.R. §§ 404.1520(a)(4)(iii) ("At the third step, we also consider the

15   medical severity of your impairment(s)") (emphasis added), 106.920(a)(4)(iii) (same).  The ALJ

16   did not err by failing to mention any vision impairment at Step 3.

17        B.  Residual Functional Capacity – Pain and Physical Limitations

18        Plaintiff argues that the medical evidence meets "the first prong of the Cotton test

19   regarding the credibility of his allegations of having severe pain and limitations in his right foot

20   . . . and right shoulder pain and limitation . . .."  Plaintiff's Motion at 14.  Under the first "prong"

21   of the test in Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986) (per curiam), plaintiff "must

22   produce medical evidence of an underlying impairment which is reasonably likely to be the cause

23   of the alleged pain."  Bunnell v. Sullivan, 947 F.3d 341, 342, 343 (9th Cir. 1991) (en banc)

24   (citing, and specifically reaffirming Cotton, 799 F.2d at 1407) ("[w]e conclude the standard

25   enunciated in Cotton v. Bowen. . . is a proper interpretation of the relevant law").  However, At

26   Step 4, the ALJ found that plaintiff's "description of the severity of the pain and symptoms has

27   been so extreme as to appear implausible."  AR 21.  The ALJ went on to explain that "the record

28   ///

1  shows that prescribed medication is generally helpful when the claimant is medication

2  compliant." Id.

3      1. Right foot pain

4      The court finds that it is undisputed that plaintiff meets the first part of the Cotton pain

5  analysis. The ALJ acknowledged that plaintiff had produced medical evidence of the underlying

6  impairment – diabetes and gout – that reasonably accounted for the pain in plaintiff's right foot.

7  AR 19-20 ("the claimant's medically determinable impairments could reasonably be expected to

8  cause the al1eged symptoms," and acknowledging that Dr. Estrin "found the medical records

9  support the claimant's allegation of diabetes . . . [and] gout with complaints of pain in the right

10  foot").

11      The second part of the pain analysis is "an analysis of the credibility of the claimant's

12  testimony regarding the severity of [his] symptoms." Smolen v. Chater, 80 F.3d 1273, 1281 (9th

13  Cir. 1996). Where the plaintiff has offered testimony of pain, and the government does not argue

14  that there is "evidence of malingering," the ALJ may reject the pain testimony only for "'specific,

15  clear and convincing reasons.'" Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (quoting

16  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)).

17      Here, the ALJ found that "the claimant's statements concerning the intensity, persistence

18  and limiting effects of these symptoms are not entirely credible for the reasons explained in this

19  decision," and that "the claimant's subject complaints and allegations regarding his functional

20  limitations are not fully credible." AR 20, 21. The court finds that there is specific, clear and

21  convincing evidence in the record for the ALJ not to credit plaintiff's assertions of pain regarding

22  his right foot.

23      Harchentan Singh Sandhu, M.D., examined plaintiff on October 1, 2009, "for an urgent

24  evaluation of gout." AR 223 (Exh. 1F). Dr. Sandhu noted that he had seen plaintiff recently for

25  an "acute onset of right-sided flare-up in the midfoot region," but that the medication prescribed

26  "has helped him a lot," and indeed the swelling and tenderness "is significantly improved." Id.

27  Dr. Sandhu prescribed indomethacin. Id. Dr. Sandhu examined plaintiff again on October 15,

28  2009, and found that plaintiff had "mild midfoot tenderness, but significantly better than before."

1   AR 222.  Dr. Sandhu examined plaintiff again on February 19, 2010, and found that plaintiff had

2   "mild right mid-foot tenderness," but that he "had significant resolution of the inflammatory

3   arthritis and the tenosynovitis at the right foot."  AR 218.  Dr. Sandhu examined plaintiff again on

4   April 15, 2010, and found only "mild" tenderness at the "right first MTP joint" – a joint in the

5   foot – and no tenderness "at the MTPs, midfoot, ankles, or knees."  AR 213.  A case analysis by

6   M. Acinas, M.D. on February 3, 2011, noted that when plaintiff takes his medications, his

7   symptoms "are near normal and controlled."  AR 330 (Exh. 12F).

8       Plaintiff does not point to any testimony or medical evidence regarding what he says is

9   plaintiff's "allegations of having severe pain and limitations in his right foot."  See Plaintiff's

10  Motion at 14.  Equally important, plaintiff does not identify any evidence that this alleged severe

11  pain – even if evidence of it could be found somewhere in the record – is not ameliorated by

12  medication.  Specifically, he does not identify any such evidence sufficient to overcome the

13  evidence cited by the ALJ that the pain was ameliorated by medication.

14                      2.  Shoulder pain

15      Plaintiff's hearing testimony regarding the pain in his shoulder appears at AR 50-51.  The

16  court finds that there is specific, clear and convincing evidence in the record to support the ALJ's

17  decision not to credit plaintiff's pain and limitations testimony regarding his shoulder.

18      Dr. Sandhu found "no synovitis present" in the shoulders.  AR 218, 223.  Edward Kazel,

19  M.D., examined plaintiff on September 30, 2010.  AR 321.  In light of plaintiff's complaints of

20  shoulder pain, Dr. Kazel ordered "x-rays for his cervical spine, x-ray of the right shoulder."  Id.

21  The October 6, 2010 x-ray results showed that plaintiff's "shoulder [is] within normal limits," and

22  that his "cervical spine is within normal limits."  AR 328.  Dr. Kazel again examined plaintiff on

23  December 16, 2010, and noted that the x-rays of the right shoulder "were essentially negative," so

24  he ordered a CT scan in light of plaintiff's continuing complaints of shoulder pain.  AR 317.  The

25  CT scan of plaintiff's right shoulder was taken on January 3, 2011.  AR 327.  The results were

26  that "[o]nly mild degenerative changes are present."  Id.

27      Plaintiff seems to argue that the ALJ erred in relying on the cervical spine x-rays, because

28  a later x-ray, dated 5-23-12, revealed:

1 mm retrolisthesis of C5 on C6 and "Mild-to-moderate bilateral osseous neural foraminal stenosis of C5-6 level is seen."

Plaintiff's Motion at 14.  However, plaintiff does not explain the meaning or consequences of these latter x-ray results – which are presented as a string of unexplained terms – nor how they should affect the ALJ's (or this court's) view of plaintiff's alleged shoulder pain and limitations.[14] While the court has access to medical dictionaries, thus allowing it to look up individual technical or medical terms as they occur, it is not generally within the court's expertise to interpret raw x-ray results, or to unscramble a string of unexplained and undefined technical and medical terms.

C.  Use of the Medical-Vocational Guidelines (the "Grids")

Plaintiff argues that because of plaintiff's alleged vision impairment, it was inappropriate for the ALJ to rely on the Medical-Vocational Guidelines.[15]  Plaintiff's Motion at 17-18.  This argument fails.  Regardless of its possible merits in other circumstances, here the argument is predicated entirely upon the existence of a medically determinable vision impairment, but as discussed above, plaintiff has not shown the existence of such an impairment.  Although the "burden" shifts to the Commissioner in Step 5, it is not the burden of establishing the existence of a severe impairment.  Rather, the burden is to show that plaintiff can do other work in the national economy, given the plaintiff's RFC, age, education and work experience:

> Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that "the claimant can perform a significant number of other jobs in the national economy."  . . .  This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

Hoopai v. Astrue, 499 F.3d 1071, 1074-75 (9th Cir. 2007) (quoting Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002)).

///

---

[14] Instead of discussing the relevance of this latter x-ray result, plaintiff immediately veers off into another discussion of his alleged vision impairment, completely abandoning any further discussion of the x-ray or its meaning.  See Plaintiff's Motion at 14.
[15] See 20 C.F.R. Pt. 404, Subpt. P, app'x 2.

VII.  CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for summary judgment (ECF No. 13), is DENIED;

2.  The Commissioner's cross-motion for summary judgment (ECF No. 18), is GRANTED; and

3.  The Clerk of the Court shall enter judgment for defendant, and close this case.

DATED:  May 15, 1915

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE